TRINA A. HIGGINS, United States Attorney #7349
THADDEUS J. MAY, Assistant United States Attorney #11317
JENNIFER E. GULLY, Assistant United States Attorney #15453
STEWART M. YOUNG, Assistant United States Attorney #14377
Attorneys for the United States of America
111 South Main, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-3080

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

---

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEIZURE WARRANT AUTHORIZING THE SEIZURE OF BITCOIN CASH AS DESCRIBED IN ATTACHMENT A, FROM THE BITCOIN CASH ADDRESSES LISTED IN ATTACHMENT A | CASE NO. 2:24mj649 JCB<br><br>AFFIDAVIT |

---

## I

### BACKGROUND AND EXPERIENCE

I, Christian Mickelsen, a Special Agent with IRS Criminal Investigation and a task force agent of the Drug Enforcement Administration, being duly sworn, deposes and states:

1.     I am a Special Agent with the Internal Revenue Service and have been employed in this capacity since September 2000.  I possess a bachelor's degree in accounting and have received extensive training in financial investigative techniques.  I am currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") and the High Intensity Drug Trafficking Area Task Force ("HIDTA") at the Salt Lake City District Office of the Drug Enforcement Administration ("DEA") and have been since January 2011.  Before transferring to Salt Lake City, Utah, I was assigned to the OCDETF and HIDTA task forces at the Las Vegas District Office of the DEA from October 2004 through December 2010.  I have conducted numerous investigations relating to violations of the internal revenue laws (Title 26, United

States Code), the Bank Secrecy Act (Title 31, United States Code), the money laundering

statutes (Title 18, United States Code, § 1956 & 1957), and related offenses.  In addition, I have

been cross designated by the Drug Enforcement Administration (DEA) with Title 21 authority to

enforce violations of the Controlled Substances Act and the Controlled Substances Import and

Export Act.  I have conducted many investigations relating to violations of 21 U.S.C.

§ 841(a)(1), Distribution and Possession with Intent to Distribute a Controlled Substance,

21 U.S.C. § 843(b), Unlawful Use of a Communication Facility and 21 U.S.C. § 846, Conspiracy

to Distribute and Conspiracy to Possess with Intent to Distribute a Controlled Substance.

2.      I am presently involved in a federal criminal investigation of Oluwole

ADEGBORUWA (ADEGBORUWA) for drug trafficking and money laundering in violation of

21 U.S.C. § 841(a)(1), Distribution and Possession with Intent to Distribute a Controlled

Substance; 21 U.S.C. § 846, Conspiracy to Distribute and Conspiracy to Possess with  Intent to

Distribute a Controlled Substance; 18 U.S.C. § 1956(h) – Conspiracy to Launder Monetary

Instruments; 18 U.S.C. § 1957 – Money Laundering Involving a Monetary Transaction

("SUBJECT OFFENSES").  I am being assisted by the Drug Enforcement Administration Metro

Narcotics Task Force ("DEA MNTF") located in Salt Lake City, UT ("DEA SLCDO").

## II

## PURPOSE OF AFFIDAVIT

3.      The purpose of this affidavit is to support an application to the Court for a seizure

warrant for all Bitcoin Cash (BCH), funds, and the entire balances that exist on, and are linked

to, the following BCH addresses and corresponding seized recovery seeds:

a)      qpj640nnk74smll7pelr9mjc9mrvkwyt6yv327nzcx (qpj640n) /

1AGZnscqcJgtNdpUt7MZGthFDyEycU1B3m (1AGZnsc)

b) qpadf0yt7p443m8skckjj55kn47067ferqkgh64qgd (qpadf0y) /

1CCUHbXBVyMnWLGJqhBnjF14kMDhK1hbTt (1CCUHbX)

c) qz2w70wcplv34elh4jyw2tj6kfuxfvtfe5jf5xk5tt (qz2w70w) /

1EaVcBrdBJWKxNz99J5n5MvhsMQCRXPtss (1EaVcBr)

4. The above Bitcoin Cash addresses are collectively referred to as the "TARGET
BCH ASSETS" and are contained in ATTACHMENT A, which is attached to and incorporated
herein by reference.

5. Seizure warrants for the assets in ATTACHMENT A are being requested to seize
the entire balances of the TARGET BCH ASSETS because: (1) they are, represent, and/or were
purchased with, the proceeds of the sale of controlled substances in violation of 21 U.S.C.
§ 841(a)(1) and 846, and/or facilitated such a violation; and/or (2) they were involved in and
traceable to transactions conducted in violation of 18 U.S.C. § 1956 and/or 1957.  For the
reasons set forth below, there is probable cause to believe the assets in ATTACHMENT A are
subject to criminal and/or civil seizure and forfeiture as follows:

**Criminal Seizure and Forfeiture**

a. Pursuant to 21 U.S.C. § 853(a), because the funds are 1) property constituting, or
derived from, any proceeds obtained, directly or indirectly, as a result of violating 21 U.S.C.
§§ 841(a)(1) (distribution or intent to distribute a controlled substance) and 846 (conspiracy
to distribute a controlled substance); or 2) property used, or intended to be used, in any
manner or part, to commit, or to facilitate the commission of, such a violation;

b. Pursuant to 18 U.S.C. § 982(a)(1), because the property was involved in a
violation of 18 U.S.C. §1956 and/or 1957 (money laundering), are traceable to such property;

    c.   Consequently, seizure of the property in ATTACHMENT A for criminal

forfeiture is authorized by 21 U.S.C. §853(e) and (f).

## Civil Seizure and Forfeiture

    a.   Pursuant to 21 U.S.C. § 881(a), because they are 1) property furnished or intended

to be furnished in exchange for controlled substances in violation of 21 U.S.C. §§ 841(a)(1)

(distribution, or intent to distribute a controlled substance) and 846 (conspiracy to distribute a

controlled substance); 2) a proceed traceable to such an exchange; or 3) money used or

intended to be used to facilitate any violation of 21 U.S.C. §§ 841(a)(1) and 846;

    b.   Pursuant to 18 U.S.C. § 981(a)(1)(A), because the property was involved in a

transaction or attempted transaction in violation of 18 U.S.C. § 1956 and/or 1957 (money

laundering), are traceable to such property; and,

    c.   Consequently, seizure of the property for civil forfeiture is authorized by 18

U.S.C. § 981(b).

    6.   A restraining order for the funds under 21 U.S.C. § 853(e) is not possible because

cryptocurrency such as BCH are decentralized and not controlled by a single entity. Therefore,

there isn't a person or entity that can accept service of the restraining order.

    7.   Collectively, the above Title 18 and Title 21 criminal and civil code sections are

referred to as the "SEIZURE OFFENSES." The United States seeks to seize the assets listed in

ATTACHMENT A.

    8.   Since this affidavit is being submitted for the limited purpose to obtain search and

seizure warrants for the property listed in ATTACHMENT A, I have not included details of

every aspect of the investigation.  My interpretations of certain statements or words are set forth

in brackets and are based upon my knowledge of this investigation and my training and

experience, including my 19 years' experience investigating drug and money laundering related

crimes. I learned the matters set out in this affidavit from my review of reports, records,

affidavits, etc., through discussions with other law enforcement officers/personnel, and from my

own investigation which caused me to believe the information to be true. The references in this

affidavit to "agents" is an all-inclusive term referring to Special Agents, Task Force Agents,

Task Force Officers, Intelligence Analysts, etc. Dates and times are approximate. Times are in

or were converted to Mountain Time (MT) unless otherwise stated.


## DEFINITIONS AND BACKGROUND REGARDING VIRTUAL CURRENCIES

9.      Virtual Currency: Virtual currencies are digital tokens of value circulated over

the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any

government or bank like traditional fiat currencies such as the U.S. dollar, but rather are

generated and controlled through computer software. Bitcoin (or BTC) is currently the most

well-known virtual currency in use. Other types of virtual currency discussed in this affidavit are

ether (ETH) which operates on the Ethereum network, Bitcoin Cash (BCH) which forked from

Bitcoin in August 2017, and Bitcoin Satoshi Vision (BSV) which forked from BCH in

November 2018. Cryptocurrency is a type of virtual currency.

10.     Virtual Currency Address: Virtual currency addresses are the particular virtual

locations to which such currencies are sent and received. A virtual currency address is analogous

to a bank account number and is represented as a string of letters and numbers.

11.     Private Key: Each virtual currency address is controlled through the use of a

unique corresponding private key, a cryptographic equivalent of a password needed to access the

address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

12.     Virtual Currency Wallet: A virtual currency wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet also allows users to send and receive virtual currencies. Multiple addresses can be stored in a wallet.

13.     Blockchain: Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. Some virtual currencies focus on privacy and portions of their blockchains are not visible online to everyone. There are different blockchains for different types of virtual currencies. BTC, ETH, BCH and BSV all have their own blockchains.

14.     Blockchain Explorer: These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API[1] and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format. Private companies such as Chainalysis and TRM Labs have proprietary software and blockchain analytical tools that further analyze blockchain data.

---

[1] API stands for application programming interface, which is a set of definitions and protocols for building and integrating application software.

15.    <u>Bitcoin</u>: Launched in 2009, bitcoin (BTC) is a virtual currency that operates on a decentralized peer-to-peer network where the transactions are recorded on a public ledger called the blockchain.

16.    <u>Ethereum</u>: Launched in 2015, Ethereum is a decentralized public blockchain with smart contract functionality. Ethereum allows the creation of smart contracts—automated code that can be used to manage financial services. Through smart contracts, one can establish a set of rules for how a financial service will work and deploy those rules to Ethereum. Once a smart contract has been deployed, it cannot be altered. The native virtual currency of the Ethereum network is ether ("ETH"), although other cryptocurrencies can operate on top of the Ethereum blockchain.

17.    <u>Bitcoin Cash</u>: Launched in 2017, BCH forked from Bitcoin in an effort to increase transaction capacity (among other reasons).

18.    <u>Bitcoin Satoshi Vision</u>: Launched in 2018, BSV forked from Bitcoin Cash in an effort to increase transaction capacity (among other reasons).

### III

### <u>FACTS ESTABLISHING PROBABLE CAUSE</u>

19.    As set forth in more detail below, I believe that the TARGET BCH ASSETS in ATTACHMENT A contain drug proceeds and were involved in transactions violating the SEIZURE OFFENSES as detailed further in the following sections:

**A. Investigation Genesis**

20.     In approximately July 2017, the DEA Salt Lake City District Office (DEA SLCDO) received information regarding a drug trafficking organization in Las Vegas, NV that was operating on the "darkweb" distributing pharmaceutical pills such as oxycodone. The DEA SLCDO received information which had been extracted during an investigation conducted by the Dutch National Police into the HANSA Darkweb marketplace.[2]  One of the customers identified from the HANSA Darkweb marketplace was Garrett Christopher, who resided in Salt Lake City, Utah, and placed orders for Oxycodone to a vendor known as "Kingodua/Alagbada726."  Based on this information, DEA Special Agent Ely Hebert and USPS Postal Inspector Megan Moore made contact with Christopher, who after initially denying his involvement, later admitted to purchasing Oxycodone and recalled some of the packages with a return address located in Las Vegas, Nevada

**B.  Investigation Progression**

21.     On March 5, 2018, a Source of Information (hereinafter referred to as "SOI") came to the DEA SLCDO to be interviewed regarding the online purchasing of illicit Narcotics from the Darkweb.  DEA SLCDO Task Force Officer (TFO) Jake Nattress, Special Agent (SA) Ely Hebert, and Intelligence Research Specialist (IRS) Cheye-anne Salyards conducted the interview.  Investigators previously received records from Dutch National Police via Europol and DEA Headquarters of Oxycodone purchases by the SOI from an individual who goes by the name "Kingodua" on the Darkweb marketplace called "HANSA."  The records showed six (6) separate Darkweb purchases by the SOI from "Kingodua" from June 30, 2017 through July 17, 2017.  The SOI was candid about the SOI's transactions on the Darkweb with "Kingodua" to

---

[2] The HANSA Darkweb marketplace, like Silkroad and Dream Markety, primarily functioned as a black market where people bought and sold items such as drugs, weapons, stolen identities and other illicit goods.  These marketplaces were accessed through the Darkweb utilizing specific software such as anonymizing browsers like TOR, described further in a separate footnote below.

investigators.  The SOI stated that s/he had a need for oxycodone based on his/her health concerns. The SOI stated the SOI then performed a Google search on how to order pain pills on the internet.  The SOI stated the search lead to a "Reddit" article which taught step by step how to purchase drugs from the Darkweb using bitcoin. The SOI stated s/he downloaded a TOR browser and shopped vendors on the "HANSA" Darkweb market.  The SOI stated s/he first ordered two batches of 2-4 Oxycodone 30 MG pills from a vendor named "Mike Mcdermitt," but the pills seemed fake and ineffective and took a long time to ship.

22.    The SOI stated s/he then saw a vendor named "Kingodua" who advertised next day shipping to the SOI's area of Utah.  The SOI admitted purchasing Oxycodone 30 MG tablets from "Kingodua" a total of six (6) times, each time in varied quantities.  The SOI stated the packages would in fact arrive the next day if ordered early enough in the day.  The SOI stated the first four (4) orders s/he received contained pills that seemed weaker than normal Oxycodone pills.  The SOI stated the fifth and sixth batch of pills seemed very potent and the SOI lost consciousness after taking two pills from the sixth order.  The SOI stated s/he took the pills from the sixth batch while at a friend's house and when the SOI lost consciousness, the SOI's friend (a nurse) had to use vigorous sternum rubs to revive him/her.  The SOI stated the friend told him/her that they were completely unresponsive and that the SOI's face turned blue for several minutes.  The SOI stated the vendor "Kingodua" advertised that his/her pills are "non-fent," meaning they did not contain fentanyl.  The SOI believed that to be untrue and believed that the pills were fake and probably did contain fentanyl.  The SOI said that in hindsight the pills appeared to be flawed from normal factory pills in that they had some imperfect edges in the inscriptions and the blue coloring seemed splotchy and inconsistent.  The SOI stated all the pills had the imprints "M/30" on them.

23.     After the sixth order, the SOI stopped purchasing these pills online and again sought treatment for her addiction.  The SOI stated the pills were shipped in a USPS shipping envelope and were always wrapped in what the SOI described as blue tinted plastic.  In SA Hebert's training and experience, this blue tinted plastic is likely Mylar, which is often utilized by drug dealers to disguise and protect the contents of the packages due to its unique barrier properties and strength.  The SOI stated the pills would arrive sometimes between two baseball cards to disguise their shape and another time the pills were shipped inside a CD-ROM case.  The SOI stated "Kingodua" also used bubble wrap to protect the product during shipping.  The SOI stated the two orders of pills purchased from the vendor "Mike McDermitt" were packaged similarly to the pills purchased from "Kingodua," in that they both shipped pills between two baseball cards to conceal the shape of the pills in the packaging.

24.     The SOI stated s/he did not keep any of the packaging materials, but recalled that the return address on the packages showed as coming from Las Vegas, Nevada.  The SOI stated they could not remember an exact address, but remembered seeing the name "Rancho" (possibly Rancho Dr. or Rio Rancho Dr.) on the shipping return address used.

25.     The SOI paid $29 per pill s/he ordered from "Kingodua" and racked up $5,000-$6,000 in debt purchasing pills online during a short, approximately one-month long period.  The SOI stated when s/he would place with orders with "Kingodua," the person that responded to the orders used proper grammar and did not use any words out of the ordinary.  The SOI stated there was nothing that stood out to in "Kingodua's" messages that would give any further insight on whom or from where this individual was.

26.     Based on the fact that packages were being sent from Las Vegas, Nevada, investigators examined customer reviews for Kingodua/Alagbada726 and found a customer who

had ordered drugs from Kingodua/Alagbada726 and had listed an unencrypted address as 18 Woodwell Circle, Amesbury, MA 01913. The DEA issued an administrative subpoena to Federal Express (FEDEX) on March 15, 2018, which was returned on March 22, 2018. In the subpoena return for deliveries to 18 Woodwell Circle, Amesbury, MA 01913, were a list of packages sent from Las Vegas, Nevada. There were 21 shipments to a Matthew Taylor at 18 Woodwell Circle, Amesbury, MA 01913, from 840 S. Rancho Dr., STE 4-626, Las Vegas, NV 89106, under FEDEX shipper customer number 882949982.

27.     On March 27, 2018, the DEA issued an administrative subpoena to FEDEX for all information pertaining to customer number 882949982, including payment information and shipment records relating to deliveries in 2017 and 2018. On April 3rd, 2018, FEDEX responded to the subpoena and confirmed the FEDEX customer number belonged to Oluwole ADEGBORUWA.

28.     Based on shipping records provided by FEDEX for shipping customer number 882949982, the DEA issued an administrative subpoena to FEDEX on April 4, 2018, for video of the identified customer sending packages. Video surveillance returned to DEA by FEDEX showed ADEGBORUWA approach the counter and send packages on various dates. The credit card listed under the above listed customer number also came back to ADEGBORUWA.

29.     Investigators also learned on the "Darkweb" market place "Dream Market" that "Kingodua" was now using the moniker "Alagbada726" to sell Oxycodone and other controlled pharmaceuticals. They learned, based on his Dream Market activities, that Kingodua/Alagbada726 sold at least Oxycodone and Xanax over the Darkweb. Payments were made by customers using the crypto-currency Bitcoin (BTC). Based on this information, SA Hebert established an undercover (UC) online identity in order to attempt drug purchases with

Kingodua/Alagbada726 through Dream Market.  SA Hebert then conducted the UC purchase after getting funds to use.

30.      On May 3, 2018, SA Hebert, witnessed by DI Cameron Bolman, logged onto Dream Market and obtained the Dream Market BTC address.  SA Hebert then copied the BTC address from the Dream Market account and pasted it in the recipient box on the Bitcoin account. When SA Hebert pushed the "Send Max" button, the Bitcoin account total was 0.04893 BTC valued at $471.91.  In order to complete this transaction, a BTC "Miner fee" was also added, which equaled BTC 0.00002 valued at $0.26, leaving a total for the transaction at BTC 0.048961, or $472.17.  SA Hebert then confirmed the transaction.  SA Hebert then went back to the Dream Market account which showed the balance in the Dream Market account to now be BTC 0.04893454.  SA Hebert then went to the vendor site for ADEGBORUWA, who was using the "Alagbada726" account, and placed an order for 10 Oxycodone 30mg pills at a cost of BTC 0.00376, or $36.40 per tablet.  A list of shipping options was provided by ADEGBORUWA and SA Hebert utilized "USPS Priority Mail 2-3 days" at a cost of BTC 0.001239, or $12.00.  SA Hebert then added this to the "cart" on the UC Dream Market account and the total cost for the 10 Oxycodone 30mg pills including the shipping came out to BTC 0.0388, which was approximately $376.00.  SA Hebert then input a shipping address and checked the box "Encrypt message" as well as the box "I understand this order is not using escrow and the vendor is being paid when he sends the package."  SA Hebert then clicked the "Order now" button and received a message stating "Product order confirmed" followed by the note "Alagbada726 has received your order."

31.      On May 7, 2018, SA Hebert contacted Postal Inspector Moore, who conducted database checks with the USPIS (U.S. Postal Inspection Service) and learned a package had

arrived at the post office where a Post Office Box had been established for this investigation. Based on this information, SA Hebert and Inspector Moore met at the Post Office to retrieve the package. They then retrieved a package from the undercover Post Office box which contained the ordered purported Oxycodone. The Oxycodone was contained inside a priority mail envelope bearing tracking number 9405536897846368675773 with a return address of "HEARING ASSOCIATES OF LV 2580 ANTHEM VILLIAGE DR STE B-05 MOORE NV 89052-5503." SA Hebert and USPI Moore transported the package to the Salt Lake City DEA Office where it was processed and found to contain pills consistent with those of Oxycodone, packaged inside heat sealed plastic and taped inside a CD/DVD case. This packaging is consistent with other packages sent by "Alagbada726."

32.     On September 27, 2018, investigators interviewed Jeremy Onofry at 5450 Oak Point Rd. Lorain, OH 44053 regarding U.S. Postal Service Priority Mail Parcel #9470136897846502927160 addressed to Jeremy Onofry, 5450 Oak Point Rd. Lorain, OH 44053 bearing return address of B and C Camera, 4511 W Sahara Ave, Las Vegas, NV 89102-3760. Onofry signed a USPIS Consent to Search form for U.S. Postal Service Priority Mail Parcel #9470136897846502927160. A review of the parcel identified 10 suspected oxycodone pills concealed inside a compact disc case. Onofry stated he purchased the pills from Dream Market Vendor Alagbada726. Onofry signed a consent to search and assume his Dream Market account username "fatsoteaching". The postal investigator reviewed Onofry's Dream Market account and confirmed the purchase. A search of Onofry's Dream Market account revealed 13 additional purchases of Oxycodone and Percocet from various vendors in the past two months. Onofry stated he purchased the pills for personal use because of a back problem. Onofry stated he has never sold any of the pills he had received.

33.     On April 12, 2019, Postal Inspector Jamie Wissler, acting in an undercover capacity, accessed Wall Street Market, an online darknet marketplace, to conduct an undercover purchase of Oxycodone from the moniker KingOdua. Postal Inspector Wissler utilized the cryptocurrency BTC to purchase the controlled substance. The approximate exchange rate of one BTC on April 12, 2019, was $5,792.95 U.S. Currency ("USC").  Vendor "KingOdua" offers various pharmaceuticals. Through the course of the investigation "KingOdua" has been identified as using the Hansa Market, Dream Market, and most recently, Wall Street Market. While acting in an undercover capacity, Inspector Wissler purchased a quantity of 30 Oxycodone pills from "KingOdua". The purchase was for 30 pills listed as "1x$36. Oxy 30mg A215/K9/M30/V48/ALG265/A51/RP30.Pharm Oxycodone" at a price of $36.00 per piece. The shipping option selected by Inspector Wissler was "USPS Priority Mail 2-3 days ($12.00)". It was notated next to the shipping option that the price of shipping would be included in the overall price. A purchase of 30 Oxycodone pills, to include Priority Mail shipping, totaled 0.21564875 BTC, $1,092.00 USC. The shipping address provided to "KingOdua" was an undercover address controlled by members of the U.S. Postal Inspection Service.

34.     On April 17, 2019, Postal Inspector Wissler notified Postal Inspector Moore the parcel had arrived at the undercover address. On April 18, 2019, Postal Inspector Moore took custody of the parcel. That same day, with the assistance of Postal Inspector Jared Dimick, the parcel was opened and the contents were revealed.  The parcel was a USPS Priority Mail envelope bearing USPS tracking number 9405 5368 97846787 9097 18, with a return address of "GTA VIDEO GAMES INC. 529 S LOS ANGELES ST B LOS ANGELES CA 90013-2728." It had an origin acceptance scan from Gardena, CA 90247, and en route scan through Los Angeles, weighing approximately 0 lbs 3 oz, with affixed EasyPost postage in the

amount of $5.25.  The parcel contained: one manila padded envelope with the writing "JW 30"
in the top left hand corner and "JW 30 P" at the center envelope, one plain white First-Class Mail
envelope, and 30 round, light blue in color pills, containing the marking "e8", appearance
consistent with oxycodone 30mg pills. The pills were secured within a small vacuum sealed clear
wrapping with the writing "30 JW-P."

35.     On May 23, 2019, agents with the DEA, IRS-CI, USPI and others, while in Las
Vegas, NV, executed a federal arrest warrant[3] on ADEGBORUWA and federal search warrants[4]
on ADEGBORUWA's vehicle and residence in Las Vegas, NV. During the arrest and search
warrants, agents seized, among other things, the following:

a.   $82,687 in U.S. currency from ADEGBORUWA's residence

b.   $259,356 in U.S. currency from ADEGBORUWA's vehicle

36.     In addition, agents seized a "hardware" device called a "Trezor" from
ADEGBORUWA's residence that is used to store private keys for virtual currency and is not
connected to the internet. Agents also seized "seed phrases"[5] or recovery seeds from
ADEGBORUWA's residence which allowed agents to identify virtual currency balances tied to
virtual currency addresses. From the Trezor device and from the seized recovery seed phrases,
agents were able to seize the following:

a.   203.4748427 bitcoins from the addresses linked to the Trezor device

b.   0.80164586 bitcoins

c.   12.35341936 bitcoins

---

[3] 2:19-mj-349, District of Utah, Judge Evelyn J. Furse, May 16, 2019
[4] 2:29-mj-364/365/366, District of Nevada, Judge Cam Ferenbach, May 20, 2019
[5] Seed phrases allow users to recover their virtual currency wallet and access their funds if their device (such as a
Trezor) is lost or damaged, or if the password or pin code is lost for a software wallet. Typically, the seed phrases
consist of 12 or 24 words. Seed phrases must be kept private and secure as anyone with the seed phrase can access
the associated funds.

d. 0.44212991 bitcoins

e. 27.9530745762 Ethereum (ETH)

37. On July 10, 2019, ADEGBORUWA was indicted in the District of Utah on one count of Conspiracy to Distribute Oxycodone.[6] The assets listed above were also included in this indictment.

38. After the initial indictment of ADEGBORUWA, agents continued their investigation. Agents analyzed evidence seized from ADEGBORUWA, his vehicle, his residence and his electronic devices. Agents determined that ADEGBORUWA was involved in a significant drug and money laundering operating and conspired with seven other individuals to include ADEGBORUWA's son, Adewole Adegboruwa, his daughter, Arinola Adegboruwa, and his girlfriend, Ashley Robinson. On January 16, 2020, the grand jury returned a superseding indictment charging ADEGBORUWA with Engaging in a Continuing Criminal Enterprise (CCE), Count 1, and several other criminal violations involving drug trafficking and money laundering, including conspiracy to commit drug and money laundering violations with Adewole Adegboruwa, Arinola Adegboruwa, Ashley Robinson and others.[7] The grand jury returned a second superseding indictment on August 2, 2023 that removed one criminal count and made other slight modifications, but the general substance of the superseding indictment remained.[8]

## C.  Trial – United States vs. Oluwole ADEGBORUWA and Enrique ISONG

39. On May 6, 2024, the USAO conducted a federal trial against Oluwole ADEGBORUWA and Enrique ISONG (ISONG). During the trial, the United States provided evidence that ADEGBORUWA, as calculated from his own records, distributed approximately

---

[6] 2:19-cr-260, District of Utah, assigned to Judge Dee Benson, July 10, 2019
[7] 2:19-cr-260, District of Utah, assigned to Judge Dee Benson, January 16, 2020
[8] 2:19-cr-260, District of Utah, assigned to Judge Jill Parish, August 2, 2023

307,985 oxycodone 30mg tablets and earned approximately $9,327,695 in drug proceeds (Govt. Ex. 630) from the distribution of these oxycodone tablets. The United States provided evidence that ADEGBORUWA was paid in virtual currency, such as bitcoin and Ethereum (ETH), by customers who purchased oxycodone. Furthermore, the United States provided evidence that ADEGBORUWA received approximately $17,558,857 in bitcoin and ETH deposits to addresses controlled by him, approximately $1,178,842 in net deposits to bank accounts controlled by him, and only reported approximately $443,458 in income to federal and state taxing authorities, leaving a variance of reported legitimate income to funds received of approximately $18,645,684 (Govt. Ex. 606).

40.     On May 20, 2024, the jury returned a verdict of guilty on all criminal counts on the second superseding indictment for ADEGBORUWA and ISONG. On May 22, 2024, the jury returned a verdict that all the seized cash, bitcoin, and ETH listed above should be forfeited to the United States.

41.     On May 17, 2024, prior to the verdict, I was reviewing evidence in preparation for the forfeiture portion of the trial. While reviewing evidence, I realized that no ETH had been seized from the Trezor device, but rather only the approximately 203 bitcoins as previously stated above. I contacted Elizabeth Bisbee (Bisbee) who testified in the ADEGBORUWA trial and was involved in the seizure of the 203 bitcoins from the Trezor device in June 2019. Bisbee works at Chainalysis and had previously worked for the DEA as a cryptocurrency analyst. She had also been designated as a cryptocurrency expert during the ADEGBORUWA/ISONG trial. Furthermore, she had participated in the investigation in 2019 and had assisted SA Herbert when they had conducted the previous forfeiture of cryptocurrency assets in June 2019.

42.   I asked Bisbee if it was possible that Ethereum/ETH remained on the Trezor device. I provided Bisbee an ETH address, 0x1f790c5C827a8B6B120064DDdF965B0554025994, that was listed in ADEGBORUWA's own records titled "ETH Address in Trezor." Bisbee researched this address in conjunction with analyzing this address using the seized seed phrases from the safe of ADEGBORUWA's residence (seized in May 2019 and discussed during the trial). Bisbee was able to determine from a blockchain analytical tool, and reconstituting the wallet balances from the seed phrases, that four ETH addresses had current balances, that these addresses were linked to the Trezor device seed phrases, and that the ETH in these wallets could be seized. Bisbee explained that the DEA had missed the ETH during the original seizure of the bitcoins from the Trezor took place in June 2019 because an Electrum wallet was used and Electrum does not read ETH. The seized recovery seed phrases for the Trezor device identified the following ETH balances linked to the following Ethereum addresses as follows:

   a.   0xB34C4e4aC9d4f26E01016894C3ed7715f1c36A8a (0xB34C4) – 45 ETH

   b.   0x1f790c5C827a8B6B120064DDdF965B0554025994 (0x1f790) - 722.816504835165395888 ETH

   c.   0x11B3fCDB29Bd188e47c9E8a436aBE317B9d51639 (0x11B3f) - 17.66 ETH

   d.   0xFCdfD022558DB3F4C46Ec8b707C586B7dCA2Db5b (0xFCdfD) - 2220.302731668609418431 ETH

43.   ETH addresses 0x1f790 and 0xFCdfD were included in Govt. Ex. 569 during the trial. While compiling Govt. Ex. 569, I noticed ETH addresses 0x1f790 and 0xFCdfD had balances, but I couldn't figure out what device or wallet they were linked to until Bisbee's analysis. Govt. Ex. 569 was a deposit analysis that contained ETH deposits to known ETH

addresses. ETH address 0x1f790 was found in ADEGBORUWA's own records on a document that also included bitcoin addresses used by ADEGBORUWA to receive oxycodone proceeds and a bitcoin address used to pay ISONG for oxycodone costs and profits. ETH address 0xFCdfD was listed in an email from ADEGBORUWA to an oxycodone customer as an Ethereum address the customer could send ETH to in an effort to purchase oxycodone. ETH addresses 0x1f790 and 0xFCdfD contained approximately 99% of the ETH and ETH value. The total ETH deposited in Govt. Ex. 569 totaled approximately 3,463 valued at approximately $738,181 at the time of the transactions. These ETH totals were then included in Govt. Ex. 606. As previously detailed, Govt. Ex. 606 contained a variance of reported legitimate income to funds received of approximately $18,645,684 – ADEGBORUWA received $18,645,684 more than he reported from legitimate sources of income to taxing authorities.

44.     On May 30, 2024, I obtained a seizure warrant for the ETH contained on the four Ethereum addresses listed above and ultimately seized the ETH/funds.[9]

45.     In addition to the ETH discovered by Bisbee on May 17, 2024, Bisbee also discovered some outstanding Bitcoin Cash. On May 20, 2024, Bisbee input additional recovery seeds into a tool that generates extended public keys from the wallet seed which can be used to identify addresses related to entered recovery seed phrases.

46.     The recovery seed beginning with the word "rely" resulted in the identification of four Bitcoin Cash (BCH) addresses:

a.     qp7r0z5yvca0vgksmaufq7u6aw636ggchvdqcksm4j

b.     qpj640nnk74smll7pelr9mjc9mrvkwyt6yv327nzcx – TARGET BCH ASSETS

c.     qpadf0yt7p443m8skckjj55kn47067ferqkgh64qgd – TARGET BCH ASSETS

---

[9] 2:24-mj-537, District of Utah, Judge Daphne A. Oberg, May 30, 2024

d.   qz2w70wcplv34elh4jyw2tj6kfuxfvtfe5jf5xk5tt – TARGET BCH ASSETS

47.     This recovery seed was separate from the recovery seed beginning with the word "weekend" that was seized from Oluwole ADEGBORUWA's residence on May 23, 2019 and linked to the Trezor device. The recovery seed beginning with the word "rely" was also seized from ADEGBORUWA's residence on May 23, 2019. This recovery seed was handwritten in a black notebook (N-49, pg. 7) and photographed during the execution of the search warrant on ADEGBORUWA's residence as captured in N-36, Image# DSC_0293. Both N-36 and N-49 were turned over in discovery in approximately July 2019. Table 1 indicates the balances on the four BCH addresses:

Table 1: BCH Address Balances

| BCH Address | BCH Balance |
| --- | --- |
| qp7r0z5yvca0vgksmaufq7u6aw636ggchvdqcksm4j | 0 |
| qpj640nnk74smll7pelr9mjc9mrvkwyt6yv327nzcx | 123.6359 |
| qpadf0yt7p443m8skckjj55kn47067ferqkgh64qgd | 2.71589921 |
| qz2w70wcplv34elh4jyw2tj6kfuxfvtfe5jf5xk5tt | 3.649310 |
| **TOTAL** | **130.00111** |

48.     Further analysis of each BCH address was conducted by Bisbee to identify the legacy address format by using a BCH converter.[10]  BCH changed the format of the address from a "Legacy address" to "Cash address" in order to prevent misuse of the addresses. Table 2 indicates the BCH address format and the legacy address format:

Table 2: Address Format

| BCH Address Format | Legacy BCH Address Format |
| --- | --- |
| qp7r0z5yvca0vgksmaufq7u6aw636ggchvdqcksm4j (qp7r0z5) | 1CKoKrFDwvXiW5cXTLyWo1LjSJ5XcNwH6B |

---

[10] https://cashaddr.bitcoincash.org/

| | |
|---|---|
| qpj640nnk74smll7pelr9mjc9mrvkwyt6y v327nzcx (qpj640n) | 1AGZnscqcJgtNdpUt7MZGthFDyE ycU1B3m (1AGZnsc) |
| qpadf0yt7p443m8skckjj55kn47067ferq kgh64qgd (qpadf0y) | 1CCUHbXBVyMnWLGJqhBnjF14k MDhK1hbTt (1CCUHbX) |
| qz2w70wcplv34elh4jyw2tj6kfuxfvtfe5jf5 xk5tt (qz2w70w) | 1EaVcBrdBJWKxNz99J5n5MvhsM QCRXPtss (1EaVcBr) |

49.     Bisbee stated the BCH addresses and corresponding balances listed in Table 1 were missed when the seized seed phrase beginning with "rely" was originally ran in June 2019 because an Electrum wallet was used to run the seized seed phrase and Electrum does not read BCH.

50.     BCH addresses qpj640n (1AGZnsc), qpadf0y (1CCUHbX), and qz2w70w (1EaVcBr) from Table 1/Table 2 are the TARGET BCH ASSETS as detailed in ATTACHMENT A.

51.     Since the blockchain is a decentralized, open-source software, updates to the blockchain's functionality can occur, referred to as a hard fork. A hard fork is a permanent split of a blockchain into two incompatible chains. Similar to a software update, the fork is due to technical changes made to the underlying consensus protocol. When there is a consensus, the blockchain's community and network agrees and plans to create the hard fork. When a hard fork is instituted, all nodes in the blockchain network are required to use the updated protocol software and continue validating the new transaction blocks.

52.     If the blockchain's community does not reach a consensus on the software update, the hard fork becomes contentious. Both forks of the chain can continue independently, each running on a subsection of the node network. As the protocol update makes the fork backwards incompatible, the chains never reconcile. At the time the fork occurs, the value of the old fork is then the value given to the new fork. For example, when the Bitcoin protocol experienced its first

fork on August 1, 2017, the Bitcoin Cash (BCH) protocol was created. Thus, if an individual owned 1 bitcoin (BTC), they would now also own 1 BCH. Table 3 represents the Bitcoin protocol hard forks:

Table 3: Bitcoin Hard Forks

| Protocol | Date of Fork | Block Forked | Split Coins |
|---|---|---|---|
| Bitcoin Cash (BCH) | August 1, 2017 | 478558 | 1 BTC = 1 BCH |
| Bitcoin Gold (BTG) | October 24, 2017 | 491407 | 1 BTC = 1 BTG |
| Bitcoin SV (BSV) | November 15, 2018 | 556766 | 1 BCH = 1 BSV |

53.   On June 11, 2024, I provided two addresses to Bisbee found in emails sent by ADEGBORUWA to customers to pay for oxycodone and other pills:

   a.   qrgegvlccxznahsxs37kkcnj4fgvf5xj45vvd6hxwd (qrgegvl)

   b.   1AGZnscqcJgtNdpUt7MZGthFDyEycU1B3m (1AGZnsc)

54.   I located BCH address qrgegvl in an email sent by ADEGBORUWA on January 17, 2018, using the email address kingodua@tutanota.com, to Irina Kay (Kay)(joe2000@tutanota.com). Kay purchased oxycodone and other pills from ADEGBORUWA. The email appeared to be a mass email that was sent out to customers listing various cryptocurrency addresses to send funds to pay for oxycodone and other pills and inventories of oxycodone and other pills. This email listed the following "Addresses To Use" to pay for pills:

   a.   BTC 1H5je2YPiFPysoRxYERZQgFz7PMz2gUVEH

   b.   ETH 0x0d7b5e7c728cee32f270c026050dea4df0941187

   c.   BCH qrgegvlccxznahsxs37kkcnj4fgvf5xj45vvd6hxwd – no transactions were recorded for this address on the blockchain

55.     Bisbee determined that 1AGZnsc was the BCH legacy address associated with
BCH address qpj640n, refer to Table 2 above.

56.     I located BCH address 1AGZnsc in an email sent by ADEGBORUWA on
January 25, 2018, using the email address kingodua@tutanota.com, to Kay
(joe2000@tutanota.com). The email appeared to be a mass email that was sent out to customers
listing various cryptocurrency addresses to send funds to pay for oxycodone and other pills and
inventories of oxycodone and other pills. For instance, in this email, "BLUES" is listed with a
quantity of "2,589" for "$32 per unit." Based on the evidence presented in trial, and on my
training and experience, I know that "BLUES" is drug code for oxycodone 30mg tablets.  This
email listed the following "Addresses To Use" to pay for pills:

  a.  BTC 1H5je2YPiFPysoRxYERZQgFz7PMz2gUVEH

  b.  ETH 0x0d7b5e7c728cee32f270c026050dea4df0941187

  c.  BCH 1AGZnscqcJgtNdpUt7MZGthFDyEycU1B3m – listed in Table 2 above

  d.  MONERO
      4BSX2ParTcSAa95icibdw4UyAbyWGnKd7YoNeHTcKfW34FUxeufGjXFiQmvLce6T
      Cw2PbCackJ2gQabQJnFGc6XvAqfvV5iLWg2QpTMcwo

57.     MONERO is a privacy coin which focuses on privacy, security and untraceability.
These same four cryptocurrency addresses listed above were contained in numerous (mass)
emails from ADEGBORUWA to Kay (and other customers) from January 25, 2018 through
December 3, 2018 as cryptocurrency addresses available to receive funds to pay for oxycodone
and other pills (BTC address changed during this time period to
3L7STFVcp8EEMi5Li4uiMe8bVT8FW7s8FL).

58.     I analyzed the three BCH addresses that are part of the TARGET BCH ASSETS in a blockchain explorer and discovered the following:

a.  **BCH qpj640n** (associated with 1AGZnsc per Table 2 and the BCH address in Kay emails detailed above) – received approximately 131.1666 valued at approximately $62,740, sent approximately 7.530694, balance 123.6359 valued at approximately $46,461 on June 18, 2023. Of the funds sent, approximately 3.649310 were sent to BCH qz2w70w.

b.  **BCH qpadf0y** – received approximately 2.71589921 valued at approximately $3,477, sent 0, balance 2.71589921, valued at approximately $1,020 on June 18, 2024. All of the BCH received of 2.71589921 was received from BCH qp7r0z5 which is an BCH address in Table 2 but doesn't have a balance so it wasn't included in the TARGET BCH ASSETS.

c.  **BCH qz2w70w** – received approximately 3.649310 valued at approximately $2,345, sent 0, balance 3.649310, valued at approximately $1,371 on June 18, 2024. All of the BCH received of 3.649310 was received from BCH qpj640n as stated in "a" above.

59.     I conducted additional analysis on BCH qpj640/1AGZnsc. This BCH address received approximately 126 deposit transactions of 131.1666 BCH valued at approximately $62,740. Of the 126 BCH deposit transactions, I confirmed that 25 BCH deposit transactions of 55.059 BCH valued at approximately $22,703 were payments by customers for 497 oxycodone and other pills through Tutanota and the Dream Market as documented in ADEGBORUWA's own records. Agents seized an Excel spreadsheet titled "Sales" from an electronic storage device in ADEGBORUWA's possession when he was arrested on May 23, 2019. The "Sales" spreadsheet documented oxycodone sales and other pills sales to customers on different Darkweb

markets and platforms such as the Empire Market, Walls Street Market, Dream Market, and through an encrypted email service named "Tutanota." I used the "Sales" spreadsheet to match the 497 oxycodone and other pills sales by ADEGBORUWA to the 25 BCH deposit transactions to BCH qpj640/1AGZnsc. The matching 25 BCH deposit transactions were designated as being paid in "BCH" in the "Sales" spreadsheet.

60.     In my analysis of the evidence seized during this investigation, and my review of the evidence presented in the trial of ADEGBORUWA, I was only able to find that BCH addresses were provided by ADEGBORUWA to customers to pay for oxycodone and other pills.

61.     The TARGET BCH ASSETS were not known by agents when Govt. Ex. 606 was prepared. If the TARGET BCH ASSETS were added to Govt. Ex. 606, it would increase the variance amount between the amount of reported legitimate income by ADEGBORUWA to funds received by ADEGBORUWA. As previously detailed, Govt. Ex. 606 contained a variance of reported legitimate income to funds received of approximately $18,645,684 – ADEGBORUWA received $18,645,684 more than he reported from legitimate sources of income to taxing authorities.

62.     On May 20, 2024 and May 21, 2024, the United States provided notice to both ADEGBORUWA's counsel and the Court about the newly discovered BCH.  See Supplemental Proposed Jury Verdict, Doc. No. 731 (and attachments), in Case No. 2:19-CR-260 JNP (filed on May 20, 2024).  Ultimately, the Court determined that the jury forfeiture phase for the previously discussed 10 properties would go ahead (which occurred on May 22, 2024) and that the parties would schedule a jury forfeiture phase for the 11th property in September 2024.

**V**

**ASSETS TO BE SEIZED – ATTACHMENT A**

63.     Based on the foregoing, I respectfully submit that there is probable cause to believe that the TARGET BCH ASSETS in ATTACHMENT A were involved in violations of the SEIZURE OFFENSES and are subject to seizure and forfeiture.

**VI**

**CONCLUSION**

64.     Based on the foregoing, my training and experience, and discussions with other law enforcement agents and individuals involved in this investigation, I believe that there is probable cause to conclude that violations of the SEIZURE OFFENSES have occurred relating to the TARGET BCH ASSETS listed in ATTACHMENT A.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief. Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Zoom.

__/s/ Christian Mickelsen_____
CHRISTIAN MICKELSEN
Special Agent
Internal Revenue Service Criminal Investigation
DEA Task Force Agent


Subscribed and sworn to before me on this 26th day of June, 2024.

_____
JARED C. BENNETT
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF UTAH